**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT**

I, James Picardi, being duly sworn, state the following:

**<u>Introduction</u>**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I have been employed as a Task Force Officer of the United States Drug Enforcement Administration ("DEA") since 2002. I am currently assigned to the Boston Office of the New England Field Division. I have served as a police officer in Revere, Massachusetts, since 1991. I was promoted to the rank of Sergeant in 1996 and served as a narcotics detective for four years. In September 2002, I was sworn in as Task Force Officer and began working with the DEA on that date through the present date.

3.      As a Task Force Officer of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of the federal drugs laws in Title 21 of the United States Code. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in

1

enforcing the criminal laws and duly authorized by the Attorney General to request search warrants.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating sources, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I am familiar with the benefits and limitations of these techniques.   I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.      By virtue of my employment as a police officer and assignment as a DEA Task Force Officer, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6.      Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to

2

effectively market those drugs to customers.   I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

7.     I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

8.     Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

## Purposes of Affidavit

9.     Since March 2021, the DEA has been investigating John DOE a.k.a. an individual with the initials L.M. with Date of Birth xx/xx/1975 and SSN: xx/xx/5479 for violations of 21 U.S.C. § 841 (possess with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances) (the "Target Subject" and the "Target Offense").

10.     I submit this affidavit in support of an application for a search warrant to search 76 West Newton Street, Apartment 3, Boston, Massachusetts 02118 (the "Target Location"). The Target Location is more specifically described in Attachment A, which I incorporate by reference.

11.     Based on the facts set forth in this affidavit, there is probable cause to believe that DOE has committed the Target Offense and that evidence of the commission of the Target Offense will be located at the Target Location

12.     I am a Task Force Officer and have conducted this investigation working closely with other DEA Special Agents and law enforcement personnel.  Accordingly, I am familiar with the facts concerning this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause for the criminal complaint and search warrants and does not set forth all of my knowledge about this matter.

**Probable Cause**

13.     On September 15, 2021, the Honorable M. Page Kelley, Chief United States Magistrate Judge, approved a criminal complaint and search warrant for DOE (21-6585-MPK and 21-6586-MPK).  I incorporate by reference my affidavit in support of that criminal complaint and search warrant.

14.     On September 16, 2021, at approximately 12:46 p.m., investigators arrested DOE pursuant to the criminal complaint.  The arrest occurred outside of a restaurant in Lawrence, Massachusetts.  Investigators searched DOE at the time of his arrest.  Pursuant to that search, investigators found approximately two packages of suspected narcotics.  One package was approximately 100 grams and the other package was approximately 25 grams.  Investigators also

found a prescription bottle of pills inside of a black satchel bag found within DOE's vehicle. The label of that prescription bottle listed DOE's alias, L.M., and an address of the Target Location.

15.     At the time of his arrest, DOE was provided with his *Miranda* warnings in Spanish. Investigators then asked DOE where he lived. DOE provided the Target Location as his address and identified a key in his possession that he said belongs to the Target Location.

16.     Over the course of this investigation, this affiant has observed DOE exit 76 West Newton Street on several occasions. Specifically, DOE was observed leaving 76 West Newton Street on July 9, 2021 and August 19, 2021 and travel to conduct narcotics transactions with the CS. Additionally, I am aware that the Honda CRV is registered to the Target Location in the name of an individual with the initials T.Z. The Massachusetts driver's license of T.Z. lists a mailing and residential address at the Target Location.

17.     I have researched records from the Boston Police Department and I am aware that on February 9, 2016 the Boston Police Department executed a search warrant at the Target Location pursuant to the arrest of DOE on state drug trafficking charges. During the execution of the warrant, officers seized a photo copy of a Massachusetts Driver's license in the name of the L.M. but depicting DOE. Agents also seized documents from the Internal Revenue Service in the name of L.M. and a photograph of DOE.

18.     On Friday March 14, 2014, DOE reported to the Boston Police Department he received a letter from the IRS telling him that he was the victim of identity theft and needed to file police report. DOE filed the police report under the name L.M., documented under BPD incident number I140156130-00, and he listed the Target Location as his home address.

**Drug Trafficker's Use of Residences, Cell Phones, and Computers Generally**

19.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

20.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers

6

often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

21.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residences. Such documents include rental or storage property agreements and receipts.

22.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for drug traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

23.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am

aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

24.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

25.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

26.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers

of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.

27.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.   Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

28.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have

been viewed via the Internet are automatically downloaded into a temporary Internet directory or

"cache."  The browser typically maintains a fixed amount of hard drive space devoted to these

files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage device

depends less on when the file was sent, downloaded, or viewed than on a particular user's

operating system, storage capacity, and habits.

29.     I have participated in the execution of numerous search warrants at the residences

of drug traffickers similar to the target of this investigation.  In a substantial number of

residential searches executed in connection with the drug investigations in which I have been

involved, the following types of drug-related evidence typically have been recovered in both

conventional and electronic formats:

   a.   controlled substances, such as fentanyl;

   b.   paraphernalia for packaging, processing, diluting, weighing, and distributing
        controlled substances, such as scales, funnels, sifters, grinders, glass panes and
        mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and
        diluents such as mannitol, mannite, and inositol;

   c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the
        distribution of controlled substances, travel for the purpose of acquiring and/or
        distributing controlled substances, and to monetary transactions involving the
        proceeds from the sale of controlled substances;

   d.   personal books, papers, and other electronic devices reflecting names, addresses,
        telephone numbers, and other contact or identification data relating to the
        distribution of controlled substances, money laundering, and the criminal use of

communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification

numbers, call forwarding information, messages drafted but not sent, and voice

messages;

h.  firearms and other dangerous weapons; and,

i.  identification evidence and/or indicia, such as cell phones with particular

numbers, mail, deeds, leases, rental agreements, photographs, bills, and

identification documents, that tend to identify the person(s) in residence,

occupancy, control, or ownership of subject premises and/or subject

communication devices.

30.     Based on all of the evidence I have obtained in the course of this investigation, and

for the reasons set forth above, I believe DOE, like many drug traffickers, uses his residence and/or

stash locations in furtherance of their ongoing drug-trafficking activities, and that, among other

things, documentary and other evidence regarding those activities, including, but not limited to,

the items set forth in Attachments B, will be found in the Target Location.  *See e.g., United States

v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

## CONCLUSION

31.     Wherefore, there is probable cause to believe DOE has committed the Target Offense, and that evidence, fruits, and instrumentalities of the Target Offense, described in Attachment B will be located at the Target Location, described in Attachment A.


Respectfully submitted,

/s/ James Picardi
_____

James Picardi, Task Force Officer
Drug Enforcement Administration


Sworn to be telephone in accordance with Fed R. Crim. P. 4.1 this 16th day of September, 2021.

_____
Hon. M. Page Kelley
Chief United States Magistrate Judge

13

Attachment A
76 W. Newton Street, Apartment 3, Boston MA

## ATTACHMENT A

### Description of the Premises to be Searched

76 West Newton Street, Apartment 3, Boston, Massachusetts 02118 hereinafter the Target

Location") and all telephones located therein.  The "Target Location" is described as follows:  76

West Newton Street, Apartment 3, Boston, Massachusetts 02118 is a three story brick apartment

structure containing 5 units.  Access to the "Target Location" is through a white colored front

door with the numbers 76 written in orange paint above the door.   The "Target Location" is

located on the second floor after utilizing two sets of stairs.  The door to the "Target Location" is

orange in color and located on the left wall next to the door is a plaque reading 76WN UNIT 3.

The "Target Location" (including the front entrance, front door, stairwell, unit mailboxes, and

door to Apartment 3) are pictured below.

 

Attachment A
76 W. Newton Street, Apartment 3, Boston MA







**ATTACHMENT B**

<u>Description of the Items to be Seized</u>

From January 1, 2020 through the present, evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance) to be seized:

1. Controlled substances, including but not limited to fentanyl.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities, including any keys to motor vehicles, real property, or commercial storage facilities.

5. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

6. Cellular telephones belonging to or used by JOHN DOE a/k/a Luis Alberto MEDINA-FELICIANO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any mobile telephone, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.  Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.  Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.  GPS data;

f.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.  Service provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the execution of the search of John DOE a.k.a. Luis Alberto MEDINA-FELICIANO described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of DOE to the sensor of any cellular telephone and/or to hold the cellular telephone in front of his face